IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v. ) | Criminal Action No. 1:20-cr-178-RDA |
| ) | |
| MARCUS FOSTER, ) | |
| ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Marcus Foster's Motion to Reduce Sentence. Dkt. 271. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the government's Opposition (Dkt. 273), and Defendant's Reply (Dkt. 274), this Court DENIES the Motion for the reasons that follow.[1]

I. FACTUAL BACKGROUND

The factual background set forth here is drawn from the Presentence Investigation Report (Dkt. 241) (the "PSR") and Statement of Facts (Dkt. 125) (the "SOF").

From around 2018 until around July 2020, Defendant Marcus Foster and his wife, codefendant Caprice Foster, conspired to steal personal identifying information ("PII") and used that information to commit bank and wire fraud. Dkt. 125 ¶¶ 4, 6. Defendant and his wife obtained

---

[1] Defendant also has pending a Motion to Request § 2255 Documents and a Motion to Vacate under 28 U.S.C. § 2255. Dkts. 266, 267. Defendant requested that those motions be held in abeyance until a ruling is issued with respect to the Motion to Reduce. Accordingly, the Court has not acted on the Motion to Vacate and will direct the parties to further brief that motion in light of the Court's ruling here.

1

PII through stealing mail and using information received from Caprice Foster's employer. *Id.* ¶ 6. They then opened bank accounts in the names of those real people, without authorization, and fabricated identification documents to falsely verify their identity as the named applicants. *Id.* ¶ 7. Those fraudulent bank accounts were then funded through other fraudulent activity, including transfers from fraudulent lines of credit, deposits from stolen checks, and other means. *Id.* ¶ 8. The Fosters also applied for and obtained loans and opened credit cards using this stolen information and used fictitious documents to verify their identity and creditworthiness. *Id.* ¶ 10. Based on this activity, the Fosters obtained hundreds of thousands of dollars. *Id.* ¶ 29.

## II. PROCEDURAL BACKGROUND

On July 30, 2020, Defendant and his wife were indicted on a single count of conspiracy to commit bank fraud. Dkt. 31. The case was originally assigned to former U.S. District Judge T.S. Ellis, III. Trial in this matter was continued a number of times due to the COVID-19 pandemic as well as the complex nature of the case, voluminous discovery, and need for counsel to be adequately prepared for trial. Dkts. 52, 55, 71.

Defendant was originally represented by the Office of the Federal Public Defender. On March 24, 2021, counsel filed a motion to withdraw, citing a conflict of interest, and that motion was granted on March 26, 2021. Dkt. 85. New counsel, Joseph Conte, was appointed as counsel. Dkt. 86.

On April 29, 2021, an eleven-count superseding indictment against the Fosters was returned, which charged the Fosters with bank fraud, wire fraud, access device fraud, aggravated identity theft, and conspiracy to commit bank and wire fraud. Dkt. 88. The matter was scheduled for a jury trial on December 7, 2021. Dkt. 106.

On November 19, 2021, Defendant filed a motion to suppress physical evidence acquired during a police search. Dkt. 116. On November 23, 2021, Defendant appeared before former U.S. District Judge Liam O'Grady for a change of plea hearing and entered a plea of guilty to Count 1 of the superseding indictment (conspiracy to commit bank and wire fraud). Dkt. 123. Judge O'Grady accepted the plea. *Id.*; Dkt. 166. Sentencing was scheduled for March 18, 2022. Dkt. 123. The sentencing was later continued, upon request from defense counsel, until April 6, 2022. Dkt. 151.

On March 30, 2022, Defendant filed a motion to withdraw his plea of guilty. Dkt. 153. On April 5, 2022, Mr. Conte moved to withdraw as counsel. Dkt. 159. After a hearing, that motion was granted, and Lana Manitta was appointed to represent Defendant. Dkt. 165. On September 15, 2022, an evidentiary hearing was held on the motion to withdraw the guilty plea. Subsequently, , Judge Ellis denied the motion to withdraw in a Memorandum Opinion. Dkt. 238.

On October 14, 2022, Judge Ellis sentenced Defendant to 58 months of imprisonment to be followed by a three-year term of supervised release. Dkt. 254. The guideline range at sentencing was 51 to 63 months, based on a total offense level of 24 and a criminal history category I. Dkt. 255.

On May 18, 2023, Defendant filed a motion to proceed *in forma pauperis*. Dkt. 262. That motion was denied without prejudice as premature by Judge Ellis. Dkt. 263. A subsequent motion for reconsideration was also denied. Dkt. 265.

On July 12, 2023, Defendant filed a motion to request documents and a motion to vacate. Dkts. 266, 267.

On December 4, 2023, Defendant, through Ms. Manitta, filed a motion to appoint counsel so that Defendant could pursue a potential sentence reduction based on the Retroactive 2023

Criminal History Amendment to the sentencing guidelines. Dkt. 269. Judge Ellis granted the motion and directed Ms. Manitta to represent Defendant with respect to the guideline changes as well as to "renew or otherwise withdraw Defendant's motion for relief under 28 U.S.C. § 2255." Dkt. 270.

On January 18, 2024, this case was reassigned to this District Judge.

On February 12, 2024, Defendant filed his Motion to Reduce. Dkt. 271. In that Motion, Defendant asks the Court to hold his § 2255 motion in abeyance pending resolution of the Motion to Reduce. *Id.* at 1 n.1. On February 27, 2024, the government filed its Opposition. Dkt. 273. On April 4, 2024, Defendant filed his Reply. Dkt. 274.

## III. ANALYSIS

As the parties recognize, on November 1, 2023, the Sentencing Commission promulgated a new guideline, U.S.S.G. § 4C1.1, that calls for a two-point decrease in offense level for certain "zero-point offenders." The parties agree that Defendant is such a "zero-point offender," but disagree whether Defendant is excluded from obtaining such a reduction pursuant to U.S.S.G. § 4C1.1(a)(6) because Defendant caused substantial financial hardship to one or more of his victims. In determining whether a defendant caused substantial financial hardship, courts are directed to examine the non-exhaustive list of factors in Application Note 4(F) of the Commentary to § 2B1.1. U.S.S.G. § 4C1.1(b)(3).[2] An examination of those factors reveals that Defendant is not eligible for a reduction and, even assuming that Defendant was eligible, the Court would not reduce his sentence in a thorough consideration of the 18 U.S.C. § 3553(a) factors.

---

[2] As relevant here, those factors include whether the offense resulted in the victim: (iii) suffering substantial loss of a retirement, education, or other savings, or investment fund; (iv) making substantial changes to his employment, such as postponing his retirement plans; and (vi) suffering substantial harm to his or her ability to obtain credit. U.S.S.G. § 2B1.1 app. note 4(F).

4

A.   Defendant Caused Substantial Hardship

The government points to the substantial financial hardship experienced by "J.T." and "E.G." who both submitted victim impact statements included with the PSR. Dkt. 241 at 50-53. On his victim impact statement, J.T. checked boxes indicating substantial hardships: "retirement savings depleted" and "delay in retirement." *Id.* at 50. J.T. personally interacted with Defendant and rented his property to Defendant. *Id.* at 51 (indicating that "Foster took possession" and that J.T. would "plead for him to move out"). J.T. indicated that he had lost $43,116.50 in unpaid rent and other fees associated with Defendant's offense. *Id.* at 52. Moreover, J.T. explained that he was "almost forced to sell my house," "will probably push back my eventual retirement by 2 years," and that he was forced to scale down his wedding to only seven people as "we no longer had the financial standing for what [his now wife] desired." *Id.* at 51. E.G. explained that Defendant's offense had a "tremendous impact" on his life and that he has great difficulty "to acquire new credit" as he has "been turned down for the an [sic] abundance of inquiries of fraudulent activity that they did do under the pretenses of my identity which has caused me quite a bit of hardship." *Id.* According to the SOF, Defendant impersonated E.G. in order to rent the home from J.T and thus accumulated unpaid rent and late fees in E.G.'s name. Dkt. 125 ¶ 25. The government contends that Defendant's actions caused substantial financial hardship to both of these victims in accordance with the factors in Application Note 4(F).

The Court agrees that Defendant's conduct with respect to these two victims (one of whom Defendant himself impersonated and the other with whom Defendant personally interacted) constitutes substantial financial hardship. Although neither party looks beyond the list of nonexclusive factors discussed in Application Note 4(F), the Court notes that various courts of appeals have held that "substantial financial hardship is 'a loss' that 'significantly impacts the

victim's resources.'" *United States v. Day*, 117 F.4th 622, 626 (5th Cir. 2024); *see also United States v. Poulson*, 871 F.3d 261, 269 (3d Cir. 2017) ("When applying the term financial hardship in the sentencing context, therefore, we ought to consider not only the pecuniary value of the loss but also such intangibles as its impact on the victim."); *United States v. Minhas*, 850 F.3d 873, 879 (7th Cir. 2017) (recognizing that a "substantial financial hardship" can include the "being deprived of [an] opportunity" because "it is a significant alteration in life circumstances"). Courts of appeals have held that, when determining whether a substantial financial hardship exists, district courts should "draw[] inferences based on a variety of facts." *Poulson*, 871 F.3d at 269.

The "significant alteration in life circumstances" is particularly notable with respect to J.T., who almost had to sell his home, incurred losses of approximately $40,000, had to dramatically scale down his wedding, and who anticipates delaying retirement by two years. Dkt. 241 at 50-52. Defendant argues that J.T.'s losses are not substantial because they are forward-looking (such as the impact on his retirement) or were luckily avoided (such as the selling of his home). Dkt. 274. But this is too strict a standard. *See Minhas*, 850 F.3d at 878 (recognizing that "between a minimal loss or hardship . . . , and a devastating loss . . . , there lies a wide range in which we rely on the judgment of the district courts"). It is clear from his victim impact letter that J.T.'s personal interactions with Defendant altered J.T.'s life circumstances and that a $40,000 loss was not a loss that he could afford. Moreover, Defendant offers no basis from which the Court should second guess J.T.'s assessment on his finances and the impact of this crime on his ability to retire. That J.T. did not suffer a devastating loss does not mean that he did not suffer a substantial hardship. Thus, the government has established that J.T. suffered a substantial financial hardship, in particular under factors (iii) and (iv) of Application Note 4(F).

Similarly, Defendant attempts to impose too strict a standard with respect to E.G. – for whom the government asserts a substantial financial hardship based on an inability to obtain credit. Inability to obtain credit is a factor which the Court is instructed to consider in Application Note 4(F). E.G. asserts that he has been "turned down" on applications for credit due to the "abundance of inquiries of fraudulent activity" after Defendant impersonated E.G. Dkt. 241 at 53. Defendant argues that the "state of E.G.'s credit prior to the conspiracy" is "unknown." Dkt. 274 at 2. To begin with, Defendant offers no basis on which to question E.G.'s assertion that he has been unable to obtain credit. Moreover, it is apparent that E.G. had at least some ability to obtain credit before the conspiracy because *Defendant* was able to obtain credit in reliance on E.G.'s identity. Dkt. 125 ¶ 25 ("MARCUS and CAPRICE used E.G.'s personal identifying information . . . to open and use fraudulent financial accounts in E.G.'s name and to apply for and obtain a residential lease in E.G.'s name from J.T."). Thus, the government has established that E.G. suffered a substantial financial hardship, in particular with respect to factor (vi) of Application Note 4(F). Accordingly, Defendant is ineligible for a reduction pursuant to the November 2023 Amendments to the guidelines.

B.  18 U.S.C. § 3553(a) Factors

Even assuming *arguendo* that Defendant is eligible for a reduction under the amendment, that does not end the analysis. As the Supreme Court has instructed that there is a two-step analysis for application of a retroactive guideline amendment, which includes an analysis of the § 3553(a) factors. *Dillon v. United States*, 560 U.S. 817, 827 (2010). Neither party addresses this second step of the analysis. The Court will.

Although Defendant had no prior criminal history, the Defendant engaged in an almost 2-year scheme to steal PII from unsuspecting individuals and then used that identifying information

7

to fraudulently obtain lines of credit and other funds. This was a serious offense that stole the identities of members of the community and then incurred huge liabilities in their names. Overall, there are fifteen victims referenced in the PSR who incurred losses to the tune of $348,808. The victim impact letters from those victims speak to the ongoing difficulties that they face due to Defendant's conduct – from the minor inconveniences associated with monitoring their credit to the substantial hardships imposed from their direct losses. This was a serious offense. Indeed, the seriousness of the offense and the impact on the victims led Judge Ellis to impose a sentence at the midpoint of the guidelines range. The length of the scheme also speaks to the need for deterrence of Defendant individually and other individuals like Defendant. The Court also notes that, unlike many of the defendants that come before the Court, Defendant is not a particularly young man (he began committing the offense conduct at 30) and thus cannot rely on youth to excuse his conduct. Accordingly, the Court finds that the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and the applicable sentencing range all weigh in favor of denying the pending motion.[3]

## III. CONCLUSION

Accordingly, it is hereby ORDERED that the Motion to Reduce (Dkt. 271) is DENIED; and it is

FURTHER ORDERED that Defendant is DIRECTED to indicate whether he intends to proceed with or withdraw his Motion to Vacate on or before January 31, 2025; and it is

---

[3] The Court notes that there is no countervailing information about Defendant's personal history, characteristics, or behavior while incarcerated.

FURTHER ORDERED that, if Defendant intends to proceed with his Motion to Vacate, he should file a supplemental brief on or before February 14, 2025, with any opposition by the government to be filed by February 28, 2025, and any reply brief due by March 14, 2025.

The Clerk of the Court is directed to provide a copy of this Order to all counsel of record and to Defendant at his last known address.

It is SO ORDERED.

Alexandria, Virginia
January 15, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge